IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TAMIKA GROSS,

                 Plaintiff,

    v.

NASHID AKILL, et al.,

                Defendants.

CIVIL ACTION
NO. 13-3373

## OPINION

Slomsky, J.                                                                    October 30, 2013

## I.      INTRODUCTION

Before the Court is a Motion to Dismiss filed by Sergeant Nashid Akill and the City of Philadelphia ("Defendants").[1]  (Doc. No. 5.)  The Motion to Dismiss seeks dismissal of the Complaint filed on June 17, 2013 by Tamika Gross ("Plaintiff") against Defendants alleging sex discrimination, hostile work environment, and retaliation, in violation of 42 U.S.C. § 2000e ("Title VII") and the Pennsylvania Human Relations Act (the "PHRA") 43 P.S. §§ 951-963.  In the Complaint, Plaintiff also brings a supplemental state law claim for assault and battery committed by individual Defendant Akill.[2]

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants seek to dismiss Counts II and III of the Complaint, which encompass the Title VII and PHRA claims.  (Doc. No. 5 at 3.) For reasons that follow, Defendants' Motion to Dismiss will be denied.

---

[1] For purposes of this Opinion, the Court has considered the Complaint (Doc. No. 1), Defendants' Motion to Dismiss (Doc. No. 5), Plaintiff's Response in Opposition (Doc. No. 6), and the arguments of counsel at the hearing held on the Motion on September 20, 2013.

[2] The supplemental state law claim is asserted in Count I of the Complaint.

## II.    BACKGROUND

On June 17, 2007, the Philadelphia Police Department hired Plaintiff as a police officer and assigned her to the 16th District in Squad 2A, where Defendant Akill was one of her supervisors.  (Doc. No. 1 at ¶ 10.)  For a little over a year, from August 2011 until September 2012, Defendant Akill made inappropriate sexual comments to Plaintiff.  Specifically, Defendant Akill asked Plaintiff out on dates, implied he wanted to have a romantic/sexual relationship with her, and repeatedly referred to her as "my baby" and "my boo."  (Id. at ¶ 11.)  Defendant Akill also made comments such as "don't fight it," "it's going to happen," "we are both adults and whatever happens stays between us," and "being faithful is played out."  (Id.)

Plaintiff's partner, Police Officer Jeanette Meizinger ("Meizinger"), overheard these comments and witnessed Defendant Akill put his hands on Plaintiff on August 23, 2011 when he arrived at the scene of an incident that Plaintiff and Meizinger were responding to.  (Id. at ¶¶ 11-12.)  Defendant Akill grabbed Plaintiff by the wrists and asked her when they were going to go out on a date.  (Id. at ¶ 12.)  At that time, Meizinger remarked that Defendant Akill was "taking this too far" and threatened to use her taser against him if he did not remove his hands from Plaintiff.  (Id.)

In September 2011, Meizinger, along with two other officers, witnessed another instance of Defendant Akill putting his hands on Plaintiff at work.  This time, Defendant Akill grabbed the collar of Plaintiff's uniform while stating, "yeah get mad, get mad."  (Id. at ¶ 13.)  Later that month, Defendant Akill approached Plaintiff and told her that he wanted to "see x-rated pictures" of her.  (Id. at ¶ 14.)  He then threatened Plaintiff by stating to her that when police officers give him a hard time, he assigns them to unfavorable assignments like "foot beats" or issues counseling memos.  (Id.)

Inappropriate comments from Defendant Akill such as "there comes my baby" and "there comes my boo" continued through December 2011.  (Id. at ¶ 16.)  At that time, Defendant Akill called Plaintiff into his office and asked her about her personal relationship with Police Officer Kenyatta Brandon.  (Id. at ¶ 17.)  According to Plaintiff, the conversation was inappropriate and not work-related.  (Id.)  The following month, in January 2012, Defendant Akill arrived on the scene of a car stop where Plaintiff was on duty.  (Id. at ¶ 18.)  After the stop, Defendant Akill followed Plaintiff back to her car and held the door open.  (Id.)  When Plaintiff asked him to let go of the door, Defendant Akill said, "you being mean to me doesn't do anything."  (Id.)  He eventually let go of the door when he noticed that Plaintiff was on the phone.  (Id.)

In March 2012, Plaintiff and her partner Meizinger were reassigned from 2-Squad to 1-Squad, based on Defendant Akill's recommendation.  (Id. at ¶ 19.)  This reassignment lasted one month, and both Plaintiff and her partner were transferred back to 2-Squad in April 2012.  (Id. at ¶ 21.)  Also in March 2012, Plaintiff complained to the Fraternal Order of Police ("FOP") and Captain Pasquale Agozzino ("Captain Agozzino") about Defendant Akill's "sexual advances, harassing and inappropriate comments, and that she felt [Defendant] Akill was treating her differently because of her sex and because she rejected his advances."  (Id. at ¶ 20.)  At that time, Captain Agozzino gave Plaintiff permission to break the chain of command if she did not feel comfortable talking to Defendant Akill about future issues such as attendance, sick days, assignments, or any other work-related issues.  (Id.)

From April 2012 through September 2012, Defendant Akill continued to make inappropriate comments to Plaintiff, referring to her as "my baby" and "my boo" every time he saw her.  (Id. at ¶ 22.)  He also made these comments in front of other officers and supervisors. (Id.)  Plaintiff repeatedly told Defendant Akill to stop.  (Id.)  According to Plaintiff, these

comments affected her ability to do her job and created a hostile work environment.  (Id. at ¶ 23.)
Defendant Akill's comments were made in front of both officers and civilians, and Plaintiff
alleges that they affected her ability to work by creating animosity and a lack of confidence in
the Police Department.  (Id.)  If Plaintiff responded negatively to the comments, Defendant Akill
would remark, "oh she's in another one of her moods."  (Id.)

In August 2012, Plaintiff notified her direct supervisor, Sergeant Snyder, that she would
be late to work one day.  (Id. at ¶ 24.)  Sergeant Snyder approved this absence, but when Plaintiff
came in late, Defendant Akill listed her as absent without leave ("AWOL") for five-and-a-half
hours.  (Id.)  Defendant Akill also threatened to issue Plaintiff a counseling memo.  (Id.)  Upon
learning that Plaintiff had reported late with Sergeant Snyder's permission, Captain Agozzino
credited Plaintiff with the lost time and pay.  (Id.)

In September 2012, Plaintiff again complained to Captain Agozzino about Defendant
Akill.  At that time, Agozzino had Plaintiff file a formal complaint with the Internal Affairs
Division ("IAD").  (Id. at ¶ 25.)  Plaintiff does not know the results of the IAD investigation, but
later that month, Defendant Akill was transferred from the 16th District to the 19th District.  (Id. at
¶¶ 25-26.)  Plaintiff's assignment did not change, and she remained in the 16th District.  (Id. at ¶
26.)  On September 17, 2012, Plaintiff also filed a charge with the Equal Employment
Opportunity Commission ("EEOC"), alleging discrimination and retaliation against Defendants
Akill and the City.  (Id. at ¶ 27.)

On March 5, 2013, while Plaintiff was not at work because she was on Injured-on-Duty
("IOD") status for a November 2012 injury, a formal disciplinary action was instituted against
her by IAD for "Conduct Unbecoming."[3]  (Id. at ¶ 29.)  The disciplinary action was commenced

---

[3] In the Complaint, the words "Conduct Unbecoming" are used.  The Court assumes the phrase

as a result of Plaintiff's alleged involvement in disputes with a neighbor, Katrina Bland,

Katrina's son Lamont Young, and other juveniles in Plaintiff's neighborhood.  (Id.)  After an

investigation of the incident, the IAD allegations were "Not Sustained."  (Id. at ¶ 30.)

On June 17, 2013, Plaintiff filed the Complaint alleging claims of sex discrimination,

hostile work environment and retaliation against the Defendant City, in violation of Title VII.

She also brought the same claims against both Defendant Akill and the City under the PHRA,

along with a state law claim for assault and battery against individual Defendant Akill.  Pursuant

to Federal Rule of Civil Procedure 12(b)(6), Defendants seek to dismiss Counts II and III of the

Complaint which, as noted, encompass the Title VII and PHRA claims.  (Doc. No. 5 at 3.)

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set

forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal it is clear that "threadbare recitals of

the elements of a cause of action, supported by mere conclusory statements do not suffice" to

defeat a Rule 12(b)(6) motion to dismiss.  Id. at 663; see also Bell Atl. Corp. v. Twombly, 550

U.S. 544 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face."  Ethypharm S.A.

France v. Abbott Labs., 707 F.3d 223, 231 n.14 (3d Cir. 2013) (citing Sheridan v. NGK Metals

Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)).  "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  Id.  Applying the principles of Iqbal and Twombly, the Third

Circuit in Santiago v. Warminster Twp., 629 F.3d 121 (3d Cir. 2010), set forth a three-part

analysis that a district court in this Circuit must conduct in evaluating whether allegations in a

complaint survive a 12(b)(6) motion to dismiss:

refers to Conduct Unbecoming of an Officer.

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). "This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'shown' — 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679. The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV.   ANALYSIS

On September 20, 2013, this Court held a hearing on the Motion to Dismiss. Defendants' procedural arguments were resolved at the hearing,[4] leaving only the claims in Counts II and III

---

[4] In the Motion to Dismiss, Defendants make three arguments as to why Plaintiff's claims are procedurally defective. First, Defendants argue that Plaintiff failed to exhaust her administrative remedies regarding the March 5, 2013 disciplinary action because she had not yet filed a charge with the EEOC regarding this incident. (Doc. No. 5 at 14-16.) Plaintiff has until January 5, 2014 to file a charge with the EEOC for this action against her and has assured the Court that she will do so in a timely fashion. The Court is satisfied that the current procedural defect will be cured. Second, Defendants argue that Plaintiff failed to state a Title VII claim against Defendant Akill because that provision does not support liability against

to be resolved.  As noted, in Count II of the Complaint, Plaintiff makes three distinct Title VII claims against the Defendant City: intentional sex discrimination, hostile work environment sexual harassment, and retaliation.  (Doc. No. 1 at ¶ 38.)  In Count III, Plaintiff makes identical claims under the PHRA against both Defendants.  (Id. at ¶ 50.)  Because PHRA claims are parallel to those under Title VII, the Court will only address the sufficiency of the claims alleged under Count II.  See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317 n.3 (3rd Cir. 2000) (explaining that Title VII and PHRA discrimination analyses are the same); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996) (explaining that Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts").

### A.  Plaintiff Alleges A Plausible Claim For Relief For Hostile Work Environment Sexual Harassment

Defendants contend that Plaintiff cannot make out a claim for sexual harassment based on a hostile work environment for two reasons.  First, according to Defendants, Plaintiff's "allegations of discrimination are not pervasive and severe enough to alter the conditions of her employment[,]" as required by Title VII and the PHRA.  (Doc. No. 5 at 7.)  Second, Defendants contend that Plaintiff "fails to establish any liability on behalf of the City" for Defendant Akill's actions.  (Id.)  The Court does not agree, and for reasons that follow, the hostile work environment claim will not be dismissed.

Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of

---

individual employees.  (Id. at 16.)  At the hearing on the Motion, Plaintiff's counsel clarified that Plaintiff does not seek to bring a Title VII claim against Defendant Akill in his individual capacity.  Therefore, this argument is moot.  Third, Defendants argue that Plaintiff's PHRA claims are time-barred because it did not appear that Plaintiff timely filed a complaint with the Pennsylvania Human Relations Commission ("PHRC").  (Id. at 16-17.)  At the hearing, however, Defendants acknowledged that a clerical error was made and that Plaintiff's PHRA claims were timely filed.  Thus, this last procedural argument is also moot.

such individual's . . . sex[.]'" 42 U.S.C.A. § 2000e-2(a)(1).  In Meritor Sav. Bank, FSB v. Vinson, the Supreme Court held that a sexual harassment claim based on a hostile work environment is actionable under this provision.  477 U.S. 57, 73 (1986).  To successfully assert a hostile work environment claim under Title VII, Plaintiff must demonstrate that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected Plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) a basis for employer liability exists. Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).  Defendants contend that Plaintiff has not pled facts sufficient to satisfy prongs two and five.  Specifically, Defendants argue that Defendant Akill's conduct was not severe and pervasive enough to affect the terms or conditions of Plaintiff's employment, and there is no basis to hold the City liable for his actions. (Doc. No. 5 at 7.)

To survive the Motion to Dismiss, Plaintiff must allege enough "factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ethypharm, 707 F.3d at 231 n.14 (citing Sheridan, 609 F.3d at 262 n.27).  Here, the question is whether the facts in the Complaint plausibly satisfy the second and fifth prongs of the cause of action.  Under the second prong, for a hostile work environment claim to be actionable, "it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor, 477 U.S. at 67 (internal brackets and quotation marks omitted).  In the Third Circuit, a hostile work environment analysis "must concentrate not on individual incidents, but on the overall scenario."  Abramson v. William Paterson Coll. of New Jersey, 260 F.3d 265, 276 (3d Cir. 2001) (quoting Andrews, 895 F.2d at 1484).  Thus, to determine whether the harassment was severe or pervasive, the Court must consider a variety of factors, "including the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001) (quotations omitted).  Because the conduct must be severe or pervasive enough to alter the conditions of employment, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotations omitted).

Defendants contend that the alleged harassment by Defendant Akill is not pervasive and severe enough to make a claim under Title VII.  (Doc. No. 5 at 7.)  As an initial matter, Plaintiff is not required to prove that the harassment was both severe and pervasive.  Instead, Plaintiff may successfully demonstrate a hostile work environment based on conduct that is either severe or pervasive.  See Meritor, 477 U.S. at 67.  Second, this Court agrees with Plaintiff that the cases cited by Defendants are distinguishable from the facts showing a hostile work environment set forth in the Complaint.

Defendants first rely on McGraw v. Wyeth-Ayerst Labs., Inc., a case in which the Court found that the alleged harassment was not sufficiently severe or pervasive.  No. 96-5780, 1997 WL 799437, at *6 (E.D. Pa. Dec. 30, 1997).  In McGraw, the plaintiff did not allege that she was humiliated by the conduct and "proffered no evidence indicating that [the defendant's] actions were so pervasive, regular, or severe as to alter the conditions of her work, nor did she allege that [his] actions interfered with her ability to do her job." Id.  Here, unlike the plaintiff in McGraw, Plaintiff does allege that Defendant Akill's harassing comments affected her ability to do her job. (Doc. No. 1 at ¶ 23.)  These comments were made in front of both police officers and civilians. (Id.)  Plaintiff argues that the comments created animosity and a lack of confidence in the Police

Department, affecting her ability to work.  (Id.)  Because Plaintiff claimed that Defendant Akill's conduct interfered with her ability to do her job, Defendants' reliance on McGraw is misplaced.

Defendants also rely on Saidu-Kamara v. Parkway Corp., a case in which the plaintiff's hostile work environment claim primarily consisted of four "sporadic and isolated incidents of harassment" over an eighteen month period.  155 F. Supp. 2d 436, 439-40 (E.D. Pa. 2001).  The Court held that this claim did not reach the level of being severe or pervasive.  By contrast, Plaintiff here alleges two instances of inappropriate physical touching by Defendant Akill, one instance of physical intimidation, three specific instances of inappropriate comments, repeated requests for dates and repeated references to Plaintiff as Defendant Akill's "baby" and "boo." (Doc. No. 5 at 8.)  These incidents are alleged to have occurred over the course of a year.  They are pervasive and severe enough to be distinguishable from the four sporadic and isolated incidents alleged in Saidu-Kamara.

Lastly, Defendants rely on Cooper-Nicholas v. City of Chester, Pa., a case in which the plaintiff could not demonstrate the "severe or pervasive" element because the alleged harassing "comments span[ned] nineteen months and thus [could not] be considered frequent or chronic." No. 95-6493, 1997 WL 799443 at *3 (E.D. Pa. Dec. 30, 1997).  That case also did not involve any allegations of physical touching or any physically threatening conduct.  Id.  Here, however, Plaintiff alleges physical touching and continued threatening behavior on the part of Defendant Akill.  Furthermore, the harassing comments here were made within a twelve month period. Accordingly, the decision in Cooper-Nicholas is based on facts very different from those alleged in this case.

Although, when considered individually, none of the events alleged by Plaintiff could be considered "severe" or "pervasive," when considered in their totality, the "overall scenario"

could be found to create a hostile work environment.  Accordingly, in construing the facts in a light most favorable to Plaintiff, Defendant Akill's conduct over the course of a year is severe or pervasive enough to satisfy the second prong of the hostile work environment test set forth in Andrews.

Defendants also challenge the sufficiency of the Complaint under the fifth prong of the Andrews test.  Under that prong, Plaintiff must demonstrate a basis for employer liability, such as respondeat superior.  Andrews, 895 F.2d at 1482.  Because an employer's liability for sexual harassment depends on whether the alleged harasser is the victim's supervisor or merely a co-worker, the analysis begins there.  The Supreme Court recently defined "supervisor" for purposes of establishing employer liability in Title VII harassment cases.  According to the Court, a "supervisor" is an employee whom the employer has empowered "to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'"  Vance v. Ball State Univ., 133 S. Ct. 2434, 2443 (2013) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  A "tangible employment action" includes "discharge, demotion, or undesirable reassignment."  Ellerth, 524 U.S. at 765 (1998); Faragher, 524 U.S. at 808.

Defendants contend that Defendant Akill is merely a co-worker who did not have the authority to take a tangible employment action against Plaintiff.  (Doc. No. 5 at 10.)  However, the Court must construe the facts in a light most favorable to Plaintiff.  Plaintiff alleges that Defendant Akill, a sergeant, was one of her supervisors.  (Doc. No. 1 at ¶ 10.)  As such, Plaintiff asserts that he had authority over the terms and conditions of her employment, overtime pay, tour of duty, hours of employment, and discipline.  (Id. at ¶ 46.)  Defendant Akill was the one who

wrote the papers declaring Plaintiff AWOL in August 2012.  (Id. at ¶ 24.)  He also told Plaintiff that when police officers gave him a hard time, he would assign them to unfavorable assignments like "foot beats" or would issue counseling memos.  (Id. at ¶ 14.)  Furthermore, the fact that Captain Agozzino gave Plaintiff permission to break the chain of command if she did not feel comfortable talking to Defendant Akill about attendance, sick days, assignments, or any other work-related issues suggests that Plaintiff would normally be required to first discuss these matters with Defendant Akill, as part of the Police Department's chain of command structure. (Id. at ¶ 20.)  Lastly, it was on Defendant Akill's recommendation that Plaintiff was reassigned from 2-Squad to 1-Squad in March 2012.[5]  (Id. at ¶ 19.)

Based on these allegations, Plaintiff has pled enough facts in her Complaint to make it plausible that Defendant Akill had the authority to effect an undesirable reassignment of Plaintiff, and therefore was her supervisor.  Although "the question of supervisor status, when contested, can very often be resolved as a matter of law before trial[,]" at this early stage before discovery, it is premature to find that Defendant Akill was merely Plaintiff's co-worker.  Vance, 133 S. Ct. at 2450.

Assuming for purposes of this Motion that Defendant Akill was Plaintiff's supervisor, Defendant City may be vicariously liable for his conduct.  "No affirmative defense is available . . . when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."  Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 808.  As stated above, the Complaint sufficiently pleads facts that could amount to a tangible employment action, rendering an affirmative defense unavailable to the Defendant City.  Because

---

[5] In the Response, and at the hearing on the Motion held on September 20, 2013, Plaintiff explained that this reassignment "changed her work shifts and scheduled days off."  (Doc. No. 6 at 13.)  Because this fact is not alleged in the Complaint, the Court cannot consider it here. However, the Court will grant Plaintiff leave to amend her Complaint to include this fact.

Plaintiff alleged enough facts to plausibly make out a claim of sexual harassment based on a hostile work environment, this claim will not be dismissed.

**B.  Plaintiff Alleges A Plausible Claim For Relief For Intentional Sex Discrimination**

Defendants next allege that Plaintiff cannot make out a claim for unlawful sex discrimination for two reasons.  First, according to Defendants, Plaintiff "does not allege any facts that she was subjected to an adverse employment action . . .."  (Doc. No. 5 at 7.)  Second, Plaintiff "does not allege any facts . . . to support an inference that any actions were motivated by an animus against her gender."  (Id.)  Once again, the Court does not agree, and for reasons that follow, Plaintiff's intentional sex discrimination claim will not be dismissed.

As previously noted, Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]"  42 U.S.C.A. § 2000e-2(a)(1).  A plaintiff alleging intentional discrimination must first establish a prima facie case under the McDonnell Douglas framework.  Rodriguez v. Nat'l R.R. Passenger Corp., 12-3062, 2013 WL 3814985, *1 (3d Cir. July 24, 2013) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). To make out a prima facie case of  sex discrimination under that framework, Plaintiff must show that she: "(1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the adverse employment action was made under circumstances that give rise to an inference of unlawful discrimination."  Id.  Defendants contend that Plaintiff has not pled facts sufficient to satisfy prongs three and four of the McDonnell Douglas framework.  Specifically, Defendants argue that Plaintiff was not subjected to any adverse employment action and did not plead facts that support an inference of discrimination. (Doc. No. 5 at 7.)

13

To survive the Motion to Dismiss, Plaintiff must have alleged enough "factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ethypharm, 707 F.3d at 231 n.14 (citing Sheridan, 609 F.3d at 262 n.27).  Here, the question is whether the facts in the Complaint plausibly satisfy the third and fourth prongs of the McDonnell Douglas framework. Under prong three, the relevant question is whether Plaintiff suffered "some form of 'adverse employment action' sufficient to evoke the protection of Title VII and the PHRA." Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 411 (3d Cir. 1999) (citations omitted).  An adverse employment action is "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir. 2004) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir.2001) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir.1997))).

In general, "[m]inor actions, such as lateral transfers and changes of title and reporting relationships" will not constitute adverse employment actions for purposes of demonstrating intentional discrimination under Title VII.  Langley v. Merck & Co., Inc., 186 F. App'x 258, 260 (3d Cir. 2006).  In the Third Circuit, however, "something less than a discharge[,]" such as a transfer or demotion, could constitute an adverse employment action to establish the third element of Plaintiff's prima facie case under McDonnell Douglas.  Jones, 198 F.3d at 411-12. See also Torre v. Casio, Inc., 42 F.3d 825, 831 n.7 (3d Cir. 1994) ("It is clear, however, that a transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action.").

In determining whether the alleged employment action was adverse, the Court must consider whether it affected Plaintiff's compensation, terms, conditions, or privileges of employment.  Storey, 390 F.3d at 764 (quotations omitted).  In her Complaint, Plaintiff lists five

14

specific examples of alleged adverse employment actions including the following:  1) From August 2011 through September 2012, Defendant Akill made inappropriate comments to Plaintiff such as calling her his "baby" and his "boo;" 2) In August 2011, Defendant Akill grabbed Plaintiff's wrists and asked when they would go on a date together; 3) In September 2011, Defendant Akill grabbed Plaintiff's collar at work and stated, "yeah get mad, get mad;" 4) In September 2011, Defendant Akill texted Plaintiff saying, "we're both adults" and "it's going to happen;" and 5) Defendant Akill appeared at Plaintiff's locations when she was on duty.[6]  (Doc. No. 1 at ¶ 39.)  Considering these allegations in their totality, they raise an inference of an adverse employment action.  For example, Plaintiff argues that Defendant Akill's repeated references to Plaintiff as his "baby" and his "boo" in front of other police officers and civilians affected Plaintiff's ability to work by creating animosity and a lack of confidence in the Police Department.  (Doc. No. 1 at ¶ 23.)  Undoubtedly, the same can be said for the other four incidents.  Each incident adversely affected the conditions of Plaintiff's employment, including her ability to spend her time on the job in a professional environment.

---

[6] In her filed Response to the Motion to Dismiss, and at the hearing on the Motion held on September 20, 2013, Plaintiff gave three additional instances of alleged discrimination: 1) Plaintiff was reassigned from 2-Squad to 1-Squad in March 2012;  2) Defendant Akill carried Plaintiff as AWOL in August 2012; and 3) Defendant City issued formal discipline against Plaintiff in March 2013.  (Doc. No. 6 at 13-15.)  In her Response, Plaintiff explains that her reassignment from 2-Squad to 1-Squad "changed her work shifts and scheduled days off." (Doc. No. 6 at 13.)  She also alleges that even though her attendance record was corrected after she was mistakenly carried AWOL, she was nonetheless "affected by the initial loss of [five] hours pay and was not afforded equal benefits of employment."  (Id. at 14.)  Furthermore, Plaintiff argues that the March 2013 disciplinary action against her constitutes an adverse employment action because it was noted in her permanent file and will affect her ability to be promoted and transferred.  (Id.)  Because these allegations are not set forth in the Complaint as individual adverse employment actions to support the claim for intentional discrimination, the Court cannot consider them here.  However, the Court will grant Plaintiff leave to amend her Complaint to include these incidents as adverse employment actions as part of her intentional sex discrimination claim.

Defendants contend that none of the incidents as alleged in the Complaint constitute adverse employment actions. But "at [the motion to dismiss stage of litigation] Plaintiff need only make sufficient allegations to plausibly allege that she suffered some type of adverse employment action. To that end, if even one of the aforementioned actions rises to the level of adverse employment action, Plaintiff's case must survive." Salvato v. Smith, No. 13-2112, 2013 WL 3431214, at *8 (E.D. Pa. July 9, 2013). Construing the facts in a light most favorable to Plaintiff, she has plausibly set forth at least one example of an adverse employment action to satisfy the third prong of McDonnell Douglas.

Defendants also contend that the Complaint fails under the fourth prong of McDonnell Douglas. The relevant inquiry under the fourth prong is whether discriminatory animus motivated the employer to take the adverse employment action. Rodriguez, 2013 WL 3814985, at *2 (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). In challenging the sufficiency of the pleadings in this regard, Defendants only focus on Plaintiff's transfer from 2-Squad to 1-Squad and the charge of AWOL, arguing that the manner in which Plaintiff was disciplined does not raise an inference of discrimination. (Doc. No. 5 at 11.) In the Complaint, however, Plaintiff's allegations rise to the level of discriminatory animus.

For example, Plaintiff argues that Defendant Akill made comments such as "there comes my baby" and "there comes my boo." (Doc. No. 1 at ¶ 40.) According to Plaintiff, she is unaware of Defendant Akill making similar comments or engaging in similar behavior with male officers. (Id.) Because Defendant Akill did not treat similarly situated male officers the same way by using this language or engaging in similar misconduct, Plaintiff has plausibly set forth facts to support an inference of intentional sex discrimination. In sum, at this stage, Plaintiff has pled sufficient facts to satisfy the fourth prong under McDonnell Douglas and has made out a

16

plausible claim for relief for intentional sex discrimination.  Therefore, Plaintiff's sex discrimination claim will not be dismissed.

### C.  Plaintiff Alleges A Plausible Claim For Relief For Retaliation

Defendants contend that Plaintiff cannot make out a claim for unlawful retaliation for two reasons.  First, Defendants assert that Plaintiff "does not allege any facts that show she was subjected to an adverse employment action . . .."[7]  (Doc. No. 5 at 7.)  Second, Defendants argue that Plaintiff fails to demonstrate "the existence of a causal connection between a protected activity and alleged adverse employment action."  (Id.)  The Court disagrees, and for reasons that follow, Plaintiff's retaliation claims under Title VII and the PHRA will not be dismissed.

Under Title VII, it is unlawful for an employer "to discriminate against any individual . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C.A. § 2000e-3(a).  Simply put, an employer may not take an adverse action against an employee who either opposes a discriminatory employment practice or files a complaint with the EEOC.  As part of a prima facie case of retaliation, Plaintiff must demonstrate that: 1) she engaged in protected activity, meaning that she either opposed an employment practice or filed a charge with the EEOC; 2) she was subjected to a contemporaneous or subsequent adverse action; and 3) there was a causal link between Plaintiff's protected activity and the adverse action.  Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).

---

[7] The "adverse action" element of a retaliation claim is not the same as the "adverse employment action" element under a McDonnell Douglas analysis.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006).

Defendant challenges the second and third prongs of Plaintiff's prima facie case for retaliation. (Doc. No. 5 at 7.)

As noted above, an "adverse action" under the second prong of a retaliation case is not identical to the "adverse employment action" prong of the McDonnell Douglas analysis described above.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").  Instead, "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 67.  Therefore, in a retaliation case, Plaintiff need only "show that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Moore, 461 F.3d at 341 (quoting Burlington, 548 U.S. at 68).  Thus, if the alleged adverse action would have kept a reasonable employee from pursuing a discrimination claim, it will be considered "materially adverse" and will satisfy the second element of a prima facie case for retaliation.  In general, "petty slights, minor annoyances, and simple lack of good manners" will not be sufficient to establish a retaliation claim.  Burlington, 548 U.S. at 68.

Here, Plaintiff alleges that Defendants retaliated against her after she engaged in protected activity on two occasions.  Plaintiff argues that she first engaged in protected activity in March 2012, when she opposed Defendant Akill's behavior by complaining about it to the FOP and Captain Agozzino.  (Doc. No. 1 at ¶ 41.)  Plaintiff asserts that she engaged in protected activity a second time, in September 2012, when she formally filed an internal complaint with Captain Agozzino and also filed a charge with the EEOC.  (Id.)  According to Plaintiff, Defendants retaliated against her for engaging in this protected activity in three ways:

18

1) Defendant Akill continued to make inappropriate comments, calling Plaintiff his "baby" and his "boo;" 2) Defendant Akill incorrectly carried Plaintiff as AWOL in August 2012 and threatened to issue her a counseling memo; and 3) Plaintiff received formal disciplinary action on March 5, 2013 for "Conduct Unbecoming."[8]  (Id. at ¶ 42.)

At the motion to dismiss stage, these incidents are sufficient to constitute adverse actions. In fact, Defendants only challenge the AWOL write-up and contend that it was nothing more than a "petty slight or minor annoyance" that was quickly resolved and is therefore not serious enough to constitute retaliation.  (Doc. No. 5 at 13.)  At this stage, however, the Court finds it is plausible that a charge of AWOL and the threat of a counseling memo could dissuade a reasonable worker from making or supporting a charge of discrimination.  Thus, Plaintiff has pled facts sufficient to satisfy the second element of a retaliation claim.[9]

Defendants also challenge Plaintiff's allegations on the third prong of her retaliation claim and contend that she does not state a plausible claim for retaliation because she did not establish the necessary causation element.  To satisfy the third element of a retaliation claim,

---

[8] Defendants read the Complaint as alleging that Plaintiff's transfer from 2-Squad to 1-Squad was an adverse act of retaliation.  The transfer was not alleged in the Complaint as an adverse act of retaliation, and at the hearing on September 20, 2013, Plaintiff's counsel clarified that the squad reassignment is not part of the retaliation claim.  Thus, the Court will not address Defendants' arguments on that point.

[9] In the Response and at the hearing on the Motion held on September 20, 2013, Plaintiff alleged that she was affected by the initial loss of pay due to the AWOL write-up and was not afforded equal benefits of employment, despite the fact that Captain Agozzino eventually corrected the error.  (Doc. No. 6 at 14.)  Before Captain Agozzino corrected Plaintiff's records, the AWOL notice was placed in her personnel file, and she was docked five-and-a-half hours pay. Furthermore, Plaintiff also alleged that the disciplinary action taken against her in March 2013 was adverse because a finding of formal discipline is part of an officer's permanent personnel file and directly affects the officer's ability to be promoted or transferred.  (Id.)  It also affects future violations and punishments.  (Id.)  Because these allegations are not set forth in the Complaint as adverse acts of retaliation, the Court cannot consider them here.  However, the Court will grant Plaintiff leave to amend her Complaint to include these incidents as part of her retaliation claim.

19

Plaintiff must demonstrate that there was a causal link between her engagement in protected activity and Defendants' adverse action.  Moore, 461 F.3d at 341 (3d Cir. 2006) (quoting Nelson, 51 F.3d at 386).  The Supreme Court recently clarified the causation requirement and held that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2528 (2013).  In this case, Plaintiff must show that if she had not complained about Defendant Akill in March 2012 and September 2012, Defendant Akill would not have continued to call Plaintiff his "baby" and his "boo;" Defendant Akill would not have carried Plaintiff as AWOL in August 2012; and Defendant City would not have instituted formal disciplinary action against her in March 2013.  See id. at 2534.  The Complaint states that after Plaintiff engaged in protected activity, "Defendants continued to discriminate against [her] and took retaliatory actions against her . . .."  (Doc. No. 1 at ¶ 41.)  At the motion to dismiss stage, Plaintiff has plausibly satisfied the causation element of a retaliation claim.  Therefore, Plaintiff's retaliation claims will not be dismissed at this time.

## V.    CONCLUSION

For the reasons listed above, Defendants' Motion to Dismiss will be denied.  As stated in footnotes 5, 6 and 9, Plaintiff is granted leave to amend her Complaint.  See Toll Bros., Inc. v. Twp. of Readington, 555 F.3d 131, 144 (3d Cir. 2009) (noting that "leave to amend should be 'freely given when justice so requires[.]'").  Plaintiff may file an Amended Complaint by November 19, 2013.